571 P.2d 683

Argyle F. WYATT, a widow, d/b/a Sunset Roofing Company, Appellant,

v.

RUCK CONSTRUCTION, INC., an Arizona Corporation, the City of Tucson, a Municipal Corporation, Arthur G. Sweet, a single man, Richard L. Stapp, a single man, and United States Fidelity & Guaranty as surety, Appellees.

No. 2 CA–CIV 2436.

Court of Appeals of Arizona, Division 2.

Aug. 26, 1977.

Rehearing Denied Oct. 5, 1977.

Review Denied Oct. 25, 1977.

DeConcini, McDonald, Brammer & Yetwin, P.C. by J. Wm. Brammer, Jr. and Robert M. Struse, Tucson, for appellant.

Lesher, Kimble & Rucker, P.C. by E. F. Rucker, Tucson, for appellees Ruck and United States Fidelity & Guaranty.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears by Robert E. Brown and P. Michael Whipple, Phoenix, for appellees City of Tucson, Stapp and Sweet.

## OPINION

HOWARD, Chief Judge.

This case arises out of a contract for the construction of the Eastside police and fire building in Tucson, entered into between the City of Tucson and the general contractor, Ruck Construction Company. A separate contract was entered into between

Ruck Construction Company and its subcontractor, Sunset Roofing Company.

The contract between Ruck and the City provided that the City could order extra work or make changes with a concomitant adjustment in the contract price. No extra work or changes involving extra costs were authorized unless they were in writing, signed by the proper City personnel, except in an emergency endangering life or property when such written authorization was not necessary. The contract between the City and Ruck also provided:

"§ 7B—Thermal Insulation

1. *ROOF AND DECK INSULATION:*

A. Perlite insulation board: non-combustible boards, FS HH–1–529, as indicated on the drawings.

JM Fesco board: Manufacturers meeting or exceeding this specification may submit to the architect for prior approval.

\* \* \* \* \* \*

§ 7C—ROOFING

3. *MATERIALS:*

A. Contractor shall arrange for the inspection of the roofing materials by the manufacturer's representative on installation of roofing.

\* \* \* \* \* \*

B. Roofing . . . shall be applied in accordance with the following Johns-Manville specifications:

Roof J–M Spec. No. 151–P

\* \* \* \* \* \*

C. Manufacturers meeting or exceeding this specification may submit to the architect for prior approval."

The contract entered into between Ruck and his subcontractor, Sunset Roofing, obliged Sunset to follow the terms of the contract between Ruck and the City and to perform its work as directed by the contractor so that the entire project could be completed on or before October 31, 1975. The contract further provided that termination could result from the failure of Sunset to follow the contractor's instructions.

In August 1975 Sunset Roofing began taking the roofing materials to the job site.

On August 12, Joe Cain, an architect from the Firm of CNWC Architects which had been hired as the fee architect on the job by the City, sent a letter to Tony Matz, the vice president of Ruck. This letter stated, inter alia:

"I note that your roofing contractor is Sunset Roofing which, I believe, is owned and operated by Mr. Chuck Osterman. I'm sure you are aware that Mr. Osterman has been in the roofing business in Tucson under many different company names. We have had several roofing failures on projects where the material was applied by Mr. Osterman's company which sometimes was due to faulty materials, sometimes due to poor workmanship and sometimes a combination of both. To date, we have never been successful in getting Mr. Osterman to pick up the tab for necessary remedial work."

The letter went on to suggest that for the reasons listed, Ruck Construction should give serious consideration to retaining a qualified fulltime inspector on the job in order to see that Sunset Roofing performed properly. Matz, surprised at the content of the letter, spoke with the owner of Ruck. They decided to place the letter in the file and not take any action.

A copy of Cain's letter was also sent to Arthur Sweet who was employed by the City as a staff architect and was one of the City's representatives under the contract between Ruck and the City. As far as he was concerned, the letter only expressed a personal opinion by Cain and it did not change his opinion of Osterman.

Around August 27 Ruck and Sunset discovered that the specified Johns-Manville fesco board was inadequate. They notified both Cain and Sweet. Cain investigated the matter and recommended to Sweet that the situation be solved by increasing the thickness of the fesco board to 1 and ½ inches. Cain also told Sweet that Johns-Manville would not inspect the roofing application unless the City purchased a Johns-Manville roof guarantee and he recommended that the guarantee be secured. Based on a conversation with a Johns-Man-

ville representative, Sweet knew that if Sunset did the roofing application, Johns-Manville would not inspect the roof and issue a guarantee. However, Sweet felt that since the specifications called for an inspection by the manufacturer and specified Johns-Manville products, Cain's recommendation was in keeping with the intent of the specification. Sweet concurred in Cain's recommendations and Ruck was notified orally of the decision. Sweet also instructed Cain to submit a written change order to Ruck but complications ensued. Sunset tried to get Johns-Manville to authorize it as a roofing applicator so that it could comply with the change. Johns-Manville refused. Cain discussed with Ruck the necessity of Ruck's cancelling its subcontract with Sunset if Sunset could not comply. However, Ruck, fearful of a lawsuit by Sunset, balked at putting any pressure on Sunset and felt that the Johns-Manville guarantee was not necessary.

The problems with the roof were delaying the whole project and on September 25, Ruck met with Sweet. Ruck brought with him a proposal by Sunset to remedy the situation. Sunset proposed to do the additional work for the sum of $5,167.50 and provide the City with a 20-year bond by a company called "Bird & Son". The bond would cost the City $1,500. Sweet refused to accept the Sunset compromise. He was not familiar with the Bird & Son Company and from his point of view the Johns-Manville's materials and guarantee had the advantage of a nationally known firm so that if troubles came 10 or 15 years later the City would be able to get reasonable service. In order to prevent further delay in the project, the City contract administrator, appellee Stapp, was placed on notice that Sunset was not technically qualified to do the work. He was told by the City architect that Sunset could not get certification as to the roofing process and that Sunset's inability to comply with the specifications and the prime contractor's refusal to take action to remedy the situation were delaying the entire project. Stapp checked the contract and the specifications to see whether or not they mandated some sort of "certification" and he was satisfied that they did. It was his impression that the Johns-Manville guarantee was required by the contract.

On September 26 Cain sent a letter to Ruck requesting it to submit a written proposal for the additional cost of changing to 1 and ½ inch-thick Johns-Manville fesco board and providing a 20-year and $20 per square foot Johns-Manville roof guarantee. Cain instructed Ruck that the roofing must start immediately. He also sent a letter to the City architect explaining the necessity of increasing the thickness of the fesco board and stating:

"Additionally, it has been brought to our attention that it is no longer possible to obtain inspection of the roofing materials or application by the manufacturer, as referred to in our specifications, without purchasing a Roof Guarantee from the manufacturer of the roofing materials. We therefore recommend that the insulation board should be 1½" thick J M Fesco board or equal and that a 20-year Roof Guarantee be furnished by the manufacturer."

Cain attached to the letter a copy of the Ruck proposal to do the additional work for the sum of $3,656.73 which included the cost of a Johns-Manville roof guarantee. In the meantime, Mr. Stapp had sent a letter to Ruck stating:

"This office has been advised that the construction of subject project is seriously behind schedule, and that no constructive effort has been made by your firm to correct the deficiencies which have occasioned the delays and other factors affecting this public works project. You are, therefore, directed to cure the following defects within ten (10) calendar days from receipt of this letter, or the City will seriously consider exercising its rights under Article VI, § 8 of the contract and hold your firm in breach. Specifically, you are directed forthwith to remove from the construction site Sunset Roofing Company, which subcontractor, in the opinion of the City, *is not qualified*

*to perform the work called for within the specifications of this contract. . . . "* (Emphasis added)

Ruck cancelled the contract with Sunset Roofing. Pursuant to its proposal, Universal Roofers, the second lowest bidder on the job, was authorized to do the roofing by virtue of a written change order signed on October 10, 1975.

The termination of Sunset's contract with Ruck resulted in the filing of this action. Appellant's first amended complaint contained 13 counts. The trial court granted summary judgment against appellant on six counts which alleged wrongful interference with a contractual relationship, defamation, a claim for damages under the Civil Rights Act (42 U.S.C.A. § 1983) and that part of Count III which prayed for punitive damages against Ruck.

The basis of the defamation counts is the letter sent by Stapp wherein he states that Sunset Roofing " . . . is not qualified to perform the work called for within the specifications of this contract."

■ Assuming arguendo, that the statements in the letter could form the basis for an action in libel, we first look at the premise upon which appellant bases her claim. It is appellant's theory that she was able to comply with the original plans and specifications. Because they did not call for a Johns-Manville roof guarantee and because the contract between the City and Ruck provided that no changes could be made in their contract unless they were in writing, Sunset Roofing was qualified to do the work under the plans and specifications as they stood on October 3, the date of Stapp's letter. Ergo, the allegation in the letter that they were not qualified was not true. We believe that the case of *Long v. Mertz*, 2 Ariz.App. 215, 407 P.2d 404 (1965) is on point and justifies the court's granting of summary judgment on the defamation charges. In *Long v. Mertz, supra*, a state highway department engineer stated that the plaintiff, whose public contractor's license had been revoked for failure to pay

an equipment rental bill, was "not a qualified contractor". Division One, following the well-reasoned opinion in *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959) held that a public officer has an absolute privilege to make a statement while doing an act in the course of his official duties which he is directed or authorized specifically by law to do. The same privilege applies here to Mr. Stapp.[1]

■ We also believe that the trial court was correct in granting summary judgment on the wrongful interference counts. It is clear that the City and its employees intentionally caused Ruck to cancel its contract with Sunset. But not every interference is actionable. If a defendant has a present, existing interest to protect such as the ownership or condition of property, or a prior contract of his own, he is privileged to prevent the performance of a contract of another which threatens it. *Meason v. Ralston Purina Company*, 56 Ariz. 291, 107 P.2d 224 (1940); Prosser, Law of Torts, 4th Ed. p. 944–945. Appellant suggests that the record shows that Sweet personally sought cancellation of the contract. We do not believe that the record supports an inference that Sweet was acting for his own benefit or was acting out of ill will towards appellant. In any event, where the defendant has a proper purpose in view, the addition of ill will towards the plaintiff will not defeat the privilege. *Ulan v. Lucas*, 18 Ariz.App. 129, 500 P.2d 914 (1972). The City was protecting its legitimate interest when it ordered Ruck to cancel the subcontract with Sunset. Furthermore, the contract between the City and Ruck, the very contract which Sunset agreed to abide by, allowed the City to make changes in the work and thus allowed it to make changes in the plans and specifications. The specifications as originally drawn clearly called for the manufacturer of the roofing materials to inspect the materials and their application and to submit a letter of compliance. Johns-Manville products or its equal were specified. Both Ruck and Sunset knew these requirements were

---

1. See also *Petroni v. Board of Regents*, 115 Ariz. 562, 566 P.2d 1038 (Ariz.App. 1977).

set forth in the specifications. Since Sunset was in the roofing business, it should have known that it could not have complied with the original plans and specifications because it was not authorized to apply Johns-Manville products and therefore it could not obtain a Johns-Manville inspection and roof guarantee. Nor does the record show that the roofing products of Bird & Son are equal to or superior to the specifications required by the City. The fault here lies not with the City or its employees, but with the appellant who could not qualify as an applicator of the roofing products and therefore prevented the inspection that was called for in the original plans and specifications. Appellant's contention that the original plans and specifications did not contain the requirement of a roof guarantee and that the specifications were substantially changed by this requirement is a "red herring". Had appellant been able to perform according to the original plans and specifications, she would have also been able to provide the roof guarantee, an extra which would have been paid for by the City.

 We also believe the trial court was correct in granting summary judgment on the count alleging the violation of the Civil Rights Act. 42 U.S.C.A. § 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law suit in equity, or other proper proceeding for redress."

The only rights protected by 42 U.S.C.A. § 1983 are rights owing their existence to the federal government, its laws, and its treaties; rights created by the Constitution of the United States; and rights protected by the Constitution. Mere tortious conduct does not constitute a violation of 42 U.S. C.A. § 1983. *Lovelace v. Leechburg Area School District*, 310 F.Supp. 579 (W.D.Pa. 1970). Damages for defamation are not recoverable under the Civil Rights Act because the defamed person has not been deprived of any rights, privileges, or immunities secured to him by the Constitution or laws of the United States. *Morey v. Independent School District # 492*, 312 F.Supp. 1257 (D.Minn.1969), adopted, 429 F.2d 428 (8th Cir. 1970).

 Citing such cases as *Peacock v. Board of Regents of Universities and State Colleges of Arizona*, 510 F.2d 1324 (9th Cir. 1975); *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), appellant claims that she had a protected property interest which the City could not terminate without due process of law which means that she was entitled to a hearing prior to cancellation of the subcontract. We do not agree with this contention. Requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. *Board of Regents v. Roth, supra*. It should be noted that the Fourteenth Amendment applies to state action and not to action by private individuals. Appellant's contract was not terminated by the City but by Ruck. Assuming arguendo that there is sufficient involvement by the City to require application of the Due Process Clause of the Fourteenth Amendment, we do not believe that the cases cited by appellant are apposite. They stand only for the proposition that a legitimate claim of entitlement to a governmentally conferred benefit constitutes "property" within the Due Process Clause of the Fifth Amendment of the Constitution. The property right involved in the cases cited by appellant was the right to public employment. We do not have that here. We only have a contractual right. In this respect, we believe the law still could be that as represented by the case of *Ream v. Handley*, 359 F.2d 728 (7th Cir. 1966) wherein the court reiterated the proposition that the Civil Rights Act does not confer jurisdiction when a person is seeking only to protect property or monetary rights.

Finally, appellant claims that the trial court erred in granting "partial summary judgment" on Count Three of her first amended complaint by striking the request for punitive damages. This action of the court was interlocutory and cannot form the basis of an appeal. Cf. *Tucson Telco Federal Credit Union v. Bowser*, 6 Ariz.App. 10, 429 P.2d 502 (1967).

The appeal as to Ruck is dismissed and the judgment of the trial court is affirmed.

HATHAWAY and SCHROEDER, JJ., concur.